**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MARYLAND**

In re:

CECIL BANCORP, INC.

Debtor.

Chapter 11
Case No.

**DISCLOSURE STATEMENT**
**WITH RESPECT TO PLAN OF REORGANIZATION OF**
**CECIL BANCORP, INC.**

Peter J. Haley
Nelson Mullins Riley & Scarborough LLP
One Post Office Square
Boston, Massachusetts 02109
Phone: (617) 217-4714
Fax: (617) 217-4750
peter.haley@nelsonmullins.com

J. Brennan Ryan
Nelson Mullins Riley & Scarborough LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, Georgia 30363

Valerie P. Morrison
Nelson Mullins Riley & Scarborough LLP
101 Constitution Ave., NW, Suite 900
Washington, DC 20001
Phone: 202 712-2800
val.morrison@nelsonmullins.com

June 30, 2017

Cecil Bancorp, Inc. ("Company" or the "Debtor") filed a petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Maryland on June 30, 2017, and a Plan of Reorganization of Cecil Bancorp, Inc. (the "Plan"). Capitalized terms used but not defined in this disclosure statement (the "Disclosure Statement") shall have the meanings ascribed to them in Article I of the Plan. The Debtor will seek confirmation of the Plan as soon as practicable. A copy of the Plan which the Debtor filed is attached to this Disclosure Statement as Exhibit A.

The Debtor is distributing this Disclosure Statement in connection with its solicitation of votes on the Plan. All holders of Claims against, Interests in, and Warrants relating to the Debtor are urged to read the Disclosure Statement and the Plan in full. The board of directors and the management of the Debtor believe that the Plan is in the best interests of holders of Claims against and Interests in the Debtor. Accordingly, holders of Claims are urged to vote in favor of the Plan.

No person has been authorized to give any information or to make any representation about the Plan not contained in this Disclosure Statement. The statements in this Disclosure Statement are made as of the date hereof. Neither the Disclosure Statement's distribution nor the Plan's consummation will, under any circumstance, create any implication that the information herein is correct at any time after the date hereof. All summaries herein are qualified by reference to the Plan as a whole. In any contested matter or adversary proceeding, this Disclosure Statement shall not constitute an admission of any fact or liability but shall be deemed a statement made in settlement negotiations. Unless otherwise indicated, the Debtor's management has provided the factual information in this Disclosure Statement. The Debtor believes that the information herein is accurate but is unable to warrant that it is without any inaccuracy or omission.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other laws governing disclosure outside the context of Chapter 11. This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission (the "SEC"), nor has the SEC passed upon the accuracy or adequacy of the statements contained herein.

In making a decision in connection with the Plan, holders of Claims must rely on their own examinations of the Debtor and the terms of the Plan, including the merits and risks involved. They should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice and each holder should consult its own advisors with respect to those matters.

## SECURITIES LAW MATTERS

The Debtor is relying on section 1145(a)(1) of the Bankruptcy Code to exempt the exchange, issuance, and distribution of the Cecil Bancorp, Inc. stock from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act") and state securities and "blue sky" laws insofar as (i) the securities are issued by a debtor, an affiliate of the debtor, or a successor to a debtor under a plan approved by a bankruptcy court; (ii) the recipients of securities hold a claim against, an interest in, or a claim for an administrative expense in the case concerning the debtor or such affiliate; and (iii) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property.

The Debtor also believes that the issuance and distribution of the Cecil Bancorp, Inc. stock will be exempt from the registration requirements of the Securities Act, and any state or local laws requiring registration, by reason of one or more exemptions therefrom, including section 4(2) of the Securities Act as a transaction not involving any public offering. Persons who receive stock under the Plan are urged to consult their own legal advisors with respect to restrictions applicable under the Securities Act and any appropriate rules and the circumstances under which securities may be sold in reliance upon any such rules.

## FORWARD-LOOKING STATEMENTS

The information presented in this Disclosure Statement includes forward-looking statements in addition to historical information. These statements involve known and unknown risks and relate to future events, our future financial performance, or our projected business results. In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "targets," "potential," or "continue" or the negative of these terms or other comparable terminology. Forward-looking statements are only predictions. Actual events or results may differ materially from any forward-looking statement as a result of various factors, including those contained in the section entitled "Risk Factors" and other sections of this Disclosure Statement, including the documents incorporated by reference herein. Although the Debtor believes that the expectations reflected in the forward-looking statements are reasonable, the Debtor cannot guarantee future results, events, levels of activity, performance, or achievements. The Debtor expressly disclaims a duty to update any of the forward-looking statements.

TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................. 8

    A. Notice to Holders of Claims, Interests, and Warrants .............................................. 9

    B. Voting Procedures, Ballots, and Voting Deadline ..................................................... 9

    C. Record Date ...................................................................................... 10

    D. Confirmation Hearing and Deadline for Objections ............................................. 10

II. PLAN SUMMARY .................................................................................. 11

    UNCLASSIFIED CLAIMS ................................................................... 12

        ADMINISTRATIVE CLAIMS ......................................................... 12

        PRIORITY TAX CLAIMS ............................................................... 12

    CLASSIFIED CLAIMS ........................................................................ 12

        Class 1 – TruPS Claims .......................................................... 12

        Class 2 - Other Secured Claims ................................................. 12

        Class 3- Other Priority Claims .................................................. 13

        Class 4 - Allowed General Unsecured Claims ................................. 13

        Class 5 – Preferred Stock Interests ............................................. 13

        Class 6 – Common Stock Interests ............................................. 13

        Class 7 - Warrants ................................................................ 13

III. HISTORY OF THE DEBTOR ................................................................. 14

    A. Overview of Business Operations ......................................................... 14

    B. Corporate Structure ........................................................................ 19

    C. Management of the Debtor ...............................................**Error! Bookmark not defined.**

    D. Operation of the Bank and Events Leading to the Restructuring Proposal ............... **Error! Bookmark not defined.**

    E. Proposed Recapitalization Transaction .................................................... 19

IV. TIMING OF THE CHAPTER 11 CASE .................................................... 20

V. THE PLAN ........................................................................................ 20

    A. Overall Structure of the Plan ............................................................. 21

    B. Classification and Treatment of Claims, Interests, and Warrants ....................... 21

        1. Unclassified Claims ................................................................ 21

(a) Administrative Claims ........................................................................................ 21

(b) Priority Tax Claims ........................................................................................... 22

(c) Professional Fees .............................................................................................. 22

(d) Fees of the Indenture Trustees ..................................... **Error! Bookmark not defined.**

2. Classified Claims, Interests, and Warrants .................................................................. 22

(a) Class 1 – the TruPS Claims. .............................................................................. 22

(b) Class 2 -Other Secured Claims ......................................................................... 23

(c) Class 3 -Other Priority Claims .......................................................................... 23

(d) Class 4 -General Unsecured Claims .................................................................. 23

(e) Class 5 – Preferred Stock Interests ................................................................... 24

(f) Class 6 – Common Stock Interests .................................................................... 24

(g) Class 7 – Warrants ............................................................................................ 24

3. Full Satisfaction ......................................................................................................... 25

4. Alternative Treatment ................................................................................................. 25

C. Means for Implementation of the Plan ............................................................................ 25

1. Continued Corporate Existence .................................................................................. 25

2. Articles of Incorporation and Bylaws ......................................................................... 25

3. Sources of Consideration for Plan Distributions ........................................................ 25

(a) New Investment ............................................................................................... 25

(b) New Common Stock ......................................................................................... 26

4. Restructuring Transactions ......................................................................................... 26

5. Cancellation of Securities ........................................................................................... 27

6. Section 1145 Exemption .............................................................................................. 27

7. Directors and Officers ................................................................................................. 28

8. Revesting of Assets ..................................................................................................... 28

9. Preservation of Rights of Action ................................................................................ 28

10. Exemption from Certain Transfer Taxes ................................................................... 28

11. Further Transactions .................................................... **Error! Bookmark not defined.**

D. Provisions Governing Distributions ................................................................................ 29

1. Delivery of Distributions; Undeliverable or Unclaimed Distributions ............................ 29

(a) Delivery of Distributions in General ................................................................ 29

(b) Undeliverable and Unclaimed Distributions ............................................................... 29

   (i) Holding of Undeliverable and Unclaimed Distributions ........................................... 29

   (ii) Failure to Claim Undeliverable Distributions ........................................................ 29

E. Treatment of Executory Contracts and Unexpired Leases ............................................ 30

   1. Assumed Contracts and Leases ............................................................................... 30

   2. Payments Related to Assumption of Contracts and Leases ...................................... 31

   3. Indemnification Obligations .................................................................................... 31

   4. Treatment of Change of Control Provisions ............................................................ 31

F. Conditions Precedent to the Plan's Confirmation and Effective Date ........................... 31

   1. Conditions to Confirmation ..................................................................................... 31

   2. Conditions to Effective Date ................................................................................... 32

G. Modification; Withdrawal ........................................................................................... 32

H. Retention of Jurisdiction ............................................................................................. 32

I. Effects of Confirmation ................................................................................................ 33

   1. Binding Effect ......................................................................................................... 33

   2. Discharge of the Debtor .......................................................................................... 33

   3. Exculpation and Limitation of Liability .................................................................. 34

   4. Releases by Debtor ................................................................................................. 34

   5. Injunction ............................................................................................................... 35

J. Miscellaneous Provisions ............................................................................................. 36

   1. Payment of Statutory Fees ...................................................................................... 36

   2. Severability of Plan Provisions ............................................................................... 36

   3. Successors and Assigns ........................................................................................... 36

   4. Term of Injunctions or Stays ................................................................................... 36

   5. Payment of Advisory Fees and Expense Reimbursement Due in Connection with New Investment ................................................................................................................. 37

K. Governing Law ........................................................................................................... 37

VI. CERTAIN RISK FACTORS TO BE CONSIDERED ................................................. 37

A. Failure to Confirm the Plan ......................................................................................... 38

B. Potential Adverse Effects of Chapter 11 ..................................................................... 38

C. Underlying Risks at the Bank Level ............................................................................. 38

    1.     Potential Credit Quality Decline ................................................................. 38

    2.     Real Estate ................................................................................................ 38

    3.     Allowance for Loan Losses ....................................................................... 38

    4.     Liquidity Risks ......................................................................................... 39

    5.     Investment Portfolio ................................................................................. 40

    6.     Interest Rate Risk ..................................................................................... 41

    7.     Key Personnel .......................................................................................... 41

    8.     Customer Information ............................................................................... 41

    9.     Litigation Risk .......................................................................................... 42

  D. Absence of Public Market; Restriction on Transferability................................ 42

  E. Dividends ......................................................................................................... 42

  F. Regional Concentration..................................................................................... 42

  G. Regulatory Matters .......................................................................................... 42

  H. Potential Dilution ............................................................................................ 43

VII. CONFIRMATION OF THE PLAN ...................................................................... 43

  A. Voting Requirements ........................................................................................ 44

  B. Feasibility of the Plan ...................................................................................... 44

  C. Best Interests Test............................................................................................ 45

  D. Confirmation Without Acceptance of All Impaired Classes – "Cramdown" ...................... 46

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.... 48

IX. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................................................................................................................. 48

  A. Certain United States Federal Income Tax Consequences to the Debtor............................ 50

    1. Cancellation of Indebtedness Income ......................................................... 50

    2. Utilization of Net Operating Losses (NOLs)................................................ 50

    3. Alternative Minimum Tax ........................................................................... 50

  B. Certain United States Federal Income Tax Consequences to Holders of Claims or Interests ................................................................................**Error! Bookmark not defined.**

  C. Importance of Obtaining Professional Tax Assistance..........**Error! Bookmark not defined.**

X. OTHER MATTERS............................................................................................... 51

XI. RECOMMENDATION AND CONCLUSION .................................................... 51

## I. INTRODUCTION

The Debtor transmits this Disclosure Statement in accordance with section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), for use in the solicitation of votes to accept the Plan. A copy of the Plan is attached to this Disclosure Statement as Exhibit A. It is the judgment of the Debtor's board of directors, management, and advisors, that the Plan and the transactions contemplated by the Plan afford the best opportunity for a restructuring that will maximize value for stakeholders under the circumstances.

The Plan provides for a reorganization and restructuring of the Debtor's capital structure in a manner designed to maximize recoveries for creditors and to enhance the financial stability of the Reorganized Debtor and the Bank. Under the Plan, the Debtor will be recapitalized with $30 million in new capital.  The new investment will yield a minimum distribution of  $1 million to the outstanding claims of trust preferred securities holders.  As part of the Plan confirmation process, the Debtor will conduct an auction of its stock in the Bank in accordance with proposed bidding procedures to determine if there are any higher and better bids for the Bank stock that will yield a greater return for the TruPS Claims.   The Plan will cancel the existing common stock in the Debtor in accordance with the closing process set forth in the Plan.   The Debtor will redeem and convert certain preferred stock and associated warrants, issued by the Debtor to the Department of the Treasury as part of the Capital Purchase Program, to common stock.  Treasury will sell that common stock to the new investors for $880,000.

Except as set forth in the subscription agreements for the new investment, all outstanding warrants, options, and contractual rights to purchase or acquire any equity interest in the Debtor will be cancelled.

The Debtor has obtained informal investment commitments of $30 million, subject to execution of written subscription agreements (the "Investment Agreements") in the form attached hereto as Exhibit B.

Prior to the Petition Date, the Debtor entered into a written Plan Support Agreement with the beneficial holders of the TruPS Claims.   The Plan Support Agreement ("PSA") incorporates a term sheet describing the treatment set forth in the Plan and commits the Debtor and the holders of the TruPS Claims to support the Plan subject to the terms and conditions of the PSA.

This Disclosure Statement, among other things, (i) contains certain information regarding the Debtor's prepetition history, (ii) describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, and distributions under the Plan, and (iii) discusses the confirmation process and voting procedures that holders of TruPS Claims must follow for their votes to be counted.

### A. Notice to Holders of Claims, Interests, and Warrants

This Disclosure Statement is being transmitted to certain holders of Claims, Interests, and Warrants for the purpose of soliciting votes on the Plan and for informational purposes. The primary purpose of this Disclosure Statement is to provide adequate information to enable those voting on the Plan to make a reasonably informed decision with respect to the Plan prior to exercising their rights to vote to accept or to reject the Plan. Subject to receiving requisite acceptances of the Plan, the Debtor expects to file a Chapter 11 petition as promptly as practicable. As soon as practicable after commencement of the bankruptcy case, the Debtor will request Bankruptcy Court approval of this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable the parties voting on the Plan to make an informed judgment about the Plan. The Debtor simultaneously will request that the Bankruptcy Court confirm the Plan.

WHEN AND IF CONFIRMED BY THE COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, INTERESTS IN, AND WARRANTS RELATING TO THE DEBTOR, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY. IN PARTICULAR, HOLDERS OF TRUPS CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO THE PLAN AND DISCLOSURE STATEMENT CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN. ONLY THE HOLDERS OF TRUPS CLAIMS AS OF THE RECORD DATE SHALL BE ALLOWED TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT IS THE PRIMARY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. NO SOLICITATION OF VOTES MAY BE MADE UNTIL DISTRIBUTION OF THIS DISCLOSURE STATEMENT, AND NO PERSON HAS BEEN AUTHORIZED TO DISTRIBUTE ANY INFORMATION CONCERNING THE DEBTOR OTHER THAN THE INFORMATION CONTAINED HEREIN.

### B. Voting Procedures, Ballots, and Voting Deadline

Accompanying this Disclosure Statement and forming a part of the solicitation package (the "Solicitation Package") are copies of (i) the Plan (Exhibit A); and (ii) for holders of TruPS Claims who are entitled to vote on the Plan (such holders, the "Voting Entities"), one or more ballots. If you did not receive a ballot in your package and believe that you are entitled to vote on the Plan, please contact counsel for the Debtor at the addresses and telephone numbers set forth on the cover of this Disclosure Statement and below.

After carefully reviewing the Plan, this Disclosure Statement, and the instructions on the enclosed ballots, (1) each holder of a TruPS Claim should indicate, by checking the appropriate box on the applicable ballot, (a) whether it votes its TruPS Claim in Class 1 in acceptance or rejection of the Plan, and (2) the Voting Entities must complete and sign their ballots and return them so that they are RECEIVED by the Voting Deadline (as defined below).

IN PARTICULAR, IF YOU ARE A HOLDER OF A TRUPS CLAIM, FOR YOUR VOTE TO BE COUNTED, YOU MUST PROPERLY COMPLETE AND DELIVER YOUR BALLOT SO THAT YOUR VOTE IS RECEIVED BY THE DEBTOR NO LATER THAN **5:00 P.M. (EASTERN TIME) ON** _____ **(THE "VOTING DEADLINE")**. IN ORDER TO PROMPTLY TRANSMIT YOUR BALLOT, YOU MUST **SEND IT BY MAIL OR OVERNIGHT DELIVERY** TO THE FOLLOWING:

Peter J. Haley
Nelson Mullins Riley & Scarborough LLP
One Post Office Square
Boston, Massachusetts 02109
Phone: (617) 573-4714
Fax: (617) 573-4750
peter.haley@nelsonmullins.com

You may obtain additional copies of the Plan, Disclosure Statement, or other material in this Solicitation Package from counsel to the Debtor.

### C. Record Date

Only the holders of Claims and Interests as of the Record Date, in the Classes entitled to vote on the Plan, shall be allowed to vote on the Plan. In addition, distributions to be made under the Plan shall be made only to the holders of Allowed Claims and Allowed Interests as of the Record Date.

### D. Confirmation Hearing and Deadline for Objections

The Debtor will ask the Bankruptcy Court to consider the adequacy of this Disclosure Statement and confirmation of the Plan at a hearing (the "Confirmation Hearing") to be held as soon as practicable at such time that the Bankruptcy Court may designate before the United States Bankruptcy Court for the District of Maryland at Baltimore,  101 W Lombard Street, Baltimore, Maryland 21201. At the Confirmation Hearing, the Debtor will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. See "Confirmation of the Plan – Confirmation Without Acceptance of All Impaired Classes – 'Cramdown.'"  The Debtor may modify the Plan, to the extent permitted by section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, as necessary to confirm the Plan.

Notice of the Confirmation Hearing and the time to present objections will be provided in accordance with the instructions to be provided by the Bankruptcy Court. The Debtor will request that the Bankruptcy Court, among other things, require that any objections to

confirmation of the Plan or related matters be filed with the Bankruptcy Court and served so that they are RECEIVED on or before the objection deadline fixed by the Bankruptcy Court by the following:

**The Debtor**

Cecil Bancorp, Inc.
 118 North Street
Elkton, Maryland  21921
Attn: Terrie G. Spiro

**Counsel to the Debtor:**

Peter J. Haley
Nelson Mullins Riley & Scarborough LLP
One Post Office Square
Boston, Massachusetts 02109

and

J. Brennan Ryan
Nelson Mullins Riley & Scarborough LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, Georgia 30363

Valerie P. Morrison
Nelson Mullins Riley & Scarborough LLP
101 Constitution Ave., NW, Suite 900
Washington, DC 20001
Phone: 202 712-2800

**United States Trustee:**

Office of the United States Trustee
101 W. Lombard St # 2625,
Baltimore, MD 21201
Attn: Attorney Assigned to In re Cecil Bancorp, Inc.

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II. PLAN SUMMARY

The following is a summary of the classification and treatment under the Plan of the

Claims against, Interests in, and Warrants relating to the Debtor. The summary contained in the table is qualified in its entirety by reference to the provisions of the Plan, a copy of which is attached hereto as Exhibit A, and by the balance of this Disclosure Statement. The classification and treatment for all Classes of Claims, Interests, and Warrants are described in more detail elsewhere in this Disclosure Statement. *See* "The Plan -Classification and Treatment of Claims, Interests, and Warrants."

UNCLASSIFIED CLAIMS

ADMINISTRATIVE CLAIMS

... *Unimpaired* – The rights of each holder of an Administrative Claim shall be Reinstated under, and shall not be Impaired by, the Plan. Each holder of an Administrative Claim shall receive Cash equal to the unpaid portion of its Administrative Claim on the date on which its Administrative Claim becomes payable under applicable law or any agreement relating thereto.

**Estimated Recovery – 100%**

PRIORITY TAX CLAIMS

*Unimpaired* – The rights of each holder of a Priority Tax Claim shall be Reinstated under, and shall not be Impaired by, the Plan. Each holder of a Priority Tax Claim shall receive Cash equal to the unpaid portion of its Priority Tax Claim on the date on which its Priority Tax Claim becomes payable under applicable law or any agreement relating thereto.

**Estimated Recovery – 100%**

CLASSIFIED CLAIMS

Class 1 – TruPS Claims

*Impaired* – Each holder of an Allowed TruPS Claim is entitled to vote to accept or reject the Plan. The TruPS Claims are Allowed Claims in the amounts set forth below. Each holder of an Allowed TruPS Claim holds a pro rata amount of such aggregate Allowed TruPS Claim as set forth in Exhibit A to the Plan.  On the Effective Date, the holders of Allowed TruPS Claims shall receive their pro rata share of  the greater of; a) $1,000,000.00 or b) the Auction Proceeds.

**Estimated Recovery – Minimum Recovery of  4.59%.**

Class 2 - Secured Claims

*Unimpaired* – Each holder of a Secured Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan. On the Effective Date, each holder of an Allowed Secured Claim shall have its claim Reinstated, and shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Secured Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed Secured Claim entitles the holder of such Claim, or (b) such other treatment as to

which the Debtor and such holder shall have agreed upon in writing.

**Estimated Recovery – 100%**

Class 3- Other Priority Claims

*Unimpaired* – Each holder of an Other Priority Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan. On the Effective Date, each holder of an Allowed Other Priority Claim shall have its claim Reinstated, and shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed Other Priority Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing.

**Estimated Recovery – 100%**

Class 4 - Allowed General Unsecured Claims

*Unimpaired* – Each holder of an Allowed General Unsecured Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan. On the Effective Date, each holder of an Allowed General Unsecured Claim shall have its claim Reinstated, and shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed General Unsecured Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing.

**Estimated Recovery – 100%**

Class 5 – Class 5: TARP Interests

*Impaired* –  All TARP Interests are Allowed Interests. On the Closing Date, the holder of the TARP Interests will exchange its TARP Interests for the Exchange Shares and will immediately thereafter sell the Exchange Shares for a cash purchase price of $880,000 in full and final satisfaction, settlement, release, and discharge of, and in exchange for, the Exchange Shares.

**Estimated Recovery – Cash Distribution of $880,000.**

Class 6 – Series B Interests

*Impaired* –  Each holder of an Allowed Series B Interest shall be deemed to reject the Plan. All Series B Interests will be cancelled and the holders shall receive no distribution.

**Estimated Recovery – 0%**

Class 7 – Common Stock Interests

*Impaired* – Each holder of a Common Stock Interest shall be deemed to reject the Plan. All Common Stock Interests will be cancelled.

**Estimated Recovery – 0%**

Class 8 – Warrants

*Impaired* – Each holder of an Allowed Warrant shall be deemed to reject the Plan. All Warrants, including, without limitation, all outstanding options, will be cancelled.

**Estimated Recovery – 0%**

## III. HISTORY OF THE DEBTOR

### A. Overview of Business Operations

The Debtor is a registered bank holding company within the meaning of the Bank Holding Company Act of 1956, as amended, that is incorporated under the laws of the State of Maryland.  It is engaged in the banking business through its wholly owned banking subsidiary, Cecil Bank (the "Bank").  The Bank commenced operations in 1959 as a Federal savings and loan association. On October 1, 2002, the Bank converted from a stock federal savings bank to a Maryland commercial bank. Its deposits have been federally insured up to applicable limits, and it has been a member of the FHLB system since 1959.

The Debtor was incorporated in 1994 for the purpose of enabling the Bank to operate within a bank holding company structure. The Debtor's principal, direct activity consists of owning the Bank, through which the Debtor derives substantially all of its revenues.

Capitalized terms not otherwise defined herein are defined in Article I of the Plan, appended hereto as Exhibit A.

The Company is registered as a holding company under the Bank Holding Company Act of 1956 and, as such, is subject to supervision and regulation by the Federal Reserve. As a holding company, the Company is required to furnish to the Federal Reserve annual and quarterly reports of its operations and additional information and reports. The Company is also subject to regular examination by the Federal Reserve.

The Bank is a member of the Federal Reserve System and is subject to supervision by the Federal Reserve and the State of Maryland.  The Federal Reserve and the State of Maryland regularly examine the operations and condition of the Bank, including, but not limited to, its capital adequacy, reserves, loans, investments, and management practices. These examinations are for the protection of the Bank's depositors and the federal Deposit Insurance Fund. In addition, the Bank is required to furnish quarterly and annual reports to the Federal Reserve. The Federal Reserve's enforcement authority includes the power to remove officers and directors and the authority to issue cease-and-desist orders to prevent a bank from engaging in unsafe or unsound practices or violating laws or regulations governing its business.

Effective June 29, 2010, the Company and the Bank entered into a written agreement with the Federal Reserve Bank of Richmond (the "Reserve Bank") and the State of Maryland Commissioner of Financial Regulation (the "Commissioner") pursuant to which the Company and the Bank have agreed to take various actions. Under the terms of the Written Agreement, the Bank has agreed to develop and submit for approval written plans to: (1) strengthen board oversight of the management and operations of the Bank; (2) strengthen credit risk management practices; (3) strengthen management of credit concentrations; (4) enhance its lending and credit administration program; (5) provide for the ongoing review and grading of the Bank's loan portfolio by a qualified independent party; (6) improve the Bank's position through repayment, amortization, liquidation, additional collateral, or other means on each loan or other asset in excess of $250,000, including other real estate owned, that is (i) 90 days or more past due as of the date of the Written Agreement, (ii) that is on the Bank's problem loan list, or (iii) that was adversely classified in a report of examination of the Bank; (7) for the use or disposition of real property acquired for Bank premises; (8) provide for the maintenance of an adequate allowance for loan and lease losses; (9) provide for contingent liquidity funding; (10) improve the Bank's earnings and overall condition; and (11) address criticisms in the most recent examination report including independent testing for BSA/AML compliance. Under the agreement, both the Company and the Bank have agreed to submit capital plans to maintain sufficient capital at the Company, on a consolidated basis, and at the Bank, on a stand-alone basis, and to refrain from declaring or paying dividends without prior regulatory approval. The Company has agreed that it will not take any other form of payment representing a reduction in the Bank's capital or make any distributions of interest, principal, or other sums on subordinated debentures or trust preferred securities without prior regulatory approval. The Company may not incur, increase, or guarantee any debt without prior regulatory approval and has agreed not to purchase or redeem any shares of its stock without prior regulatory approval.

On August 7, 2015 a Prompt Corrective Action Directive (the "Directive") was issued to the Bank by the Board of Governors of the Federal Reserve System. The Directive requires the Bank, among other things, to to (1) increase its capital accounts to the "Adequately Capitalized" category, or (2) enter into and close a contract that will result in the Bank being acquired by another depository institution. The Directive prohibits the Bank from accepting any brokered deposits. Further, the Directive sets a ninety-day time limit, subject to extension, to accomplish one of the two above alternatives.

The Debtor is the direct parent of the Bank. The Debtor also owns 100% of the stock of Cecil Bancorp Capital Trust I ("Trust I") and Cecil Bancorp Capital Trust II ("Trust II" and together with Trust I, the "Trusts"). The Trusts are Delaware statutory trusts that were established for the sole purpose of issuing capital securities.

The Debtor formed the Trusts to issue capital securities (the "Trust Preferred Securities" or "TruPS") to raise funds for the Bank. This financing mechanism is a common one in the banking industry. The Trust Preferred Securities are governed by the terms of written debentures (the "TruPS Documents"). The Debtor formed the statutory trusts and issued subordinated notes to the Trusts as detailed below. The notes are the sole assets of the Trusts. The Trusts in turn issued Trust Preferred Securities mirroring the terms of the subordinated notes to various investors. The Debtor used the proceeds of the notes to invest capital in the Bank. Under the proposed capital structure, it was contemplated that the Bank then in turn would make dividend

payments to the Debtor enabling it to service the obligations under the notes.  As is typical for these securities, they each have an option to defer all interest due under the notes a period of five years, absent default.  As the operating Bank is the sole source of repayment for the Trust Preferred Securities, any weakness in the Bank or inability to make payment impairs the value of the Trust Preferred Securities.

As of March 31, 2017, the Debtor had outstanding principal indebtedness totaling $17,527,000 attributable to the Junior Subordinated Debentures underlying the Trust Preferred Securities, and accrued and unpaid interest attributable to the Trust Preferred Securities of approximately $4,123,735 as described below.

In March 2006, the Debtor issued $10,310,000 Floating Rate Junior Subordinated Deferrable Interest Debentures due March 23, 2036.  The Trust Preferred Securities bear interest at a variable rate per annum, reset quarterly, equal to 3-month LIBOR plus 1.38 percent.  The Debtor formed and capitalized Trust I through the issuance of the Trust I Junior Subordinated Debentures. The Debtor owns 100% of the issued and outstanding Common Securities of Trust I.

In November 2006, the Debtor issued $7,217,000 Floating Rate Junior Subordinated Deferrable Interest Debentures due March 6, 2037.  The Trust Preferred Securities bear interest at a variable rate per annum, reset quarterly, equal to 3-month LIBOR plus 1.68 percent.  The Debtor formed and capitalized Trust II through the issuance of the Trust II Junior Subordinated Debentures. The Debtor owns 100% of the issued and outstanding Common Securities of Trust II.

On March 6, 2015, the Debtor failed to make the scheduled payments of defined interest on the Trust Preferred Securities constituting an event of default under the indentures.

On December 23, 2008, as part of the Troubled Asset Relief Program ("TARP") Capital Purchase Program, the Company sold 11,560 shares of fixed rate cumulative perpetual preferred stock, series A, and a warrant to purchase 523,076 shares (after adjusting for the 2-for-1 stock split approved by the Board of Directors in May 2011) of the Company's common stock to the United States Department of the Treasury for an aggregate purchase price of $11.560 million in cash, with $37,000 in offering costs, and net proceeds of $11.523 million. The preferred stock and the warrant were issued in a private placement exempt from registration pursuant to Section 4(2) of the Securities Act of 1933, as amended.  As of March 31, 2017, the Debtor had outstanding principal indebtedness totaling $11,560,000 attributable to the TARP Preferred Stock, and accrued and unpaid dividends and interest attributable to the TARP Preferred Stock of approximately $5,940,964.

The Bank also owns 100% of the stock of Cecil Financial Services Corporation, which previously sold non-deposit investment and insurance products.  The Bank is also sole member of Cecil Real Properties, LLC, Novo Realty, LLC, Route 9 Old New Castle, LLC, and Chesapeake Club Subdivision, LLC, all of which hold real estate owned by the Bank.

B. Corporate Structure



C. Management of the Debtor

Set forth in the Table below are the names, positions or position and periods of service of the current Board of Directors of the Debtor and key executive officers.  The Board of Directors oversees the business and affairs of the Debtor.

| Name | Position | Period of Service |
|------|----------|-------------------|
| William F. Ariano, Jr. | Director | 2014 – Present |
| William H. Cole, IV | Director | 2008 – Present |
| Robert A. Payne, III | Director | 2014 – Present |
| Terrie G. Spiro | President & CEO | 2013 – Present |
| Thomas L. Vaughan | Director | 2003 – Present |
| R. Lee Whitehead | CFO | 2004 – Present |

D. Operation of the Bank and Events Leading to the Restructuring Proposal

The Bank commenced operations in 1959 as a Federal savings and loan association. On October 1, 2002, the Bank converted from a stock federal savings bank to a Maryland commercial bank. The Bank's deposits are insured up to the maximum allowable amount by the Federal Deposit Insurance Corporation ("FDIC"). The Bank is regulated by the Maryland Commissioner of Financial Regulation and the Federal Reserve Bank of Richmond.

As of March 31, 2017, the Bank has total assets of approximately $211 million, outstanding loans of approximately $94 million and total deposits of approximately $154 million.

The Bank has approximately 52 employees, a main branch, 8 branch locations, and a corporate/loan office. The Bank offers checking, savings, money market accounts, mortgages, home equity and other consumer loans, and related consumer financial services. The Bank also provides banking services to businesses, including checking accounts, lines of credit, secured loans and commercial real estate loans. The Bank's branches serve as the primary vehicle through which it offers products, cross sells additional products to existing customers, and generates new customer relationships. In addition to its branch network, the Bank provides products and services through its online banking system.

The Bank has an outstanding line of credit with the Federal Home Loan Bank of Atlanta. As of March 31, 2017, there was approximately $53.5 million outstanding under this line of credit with maturity dates of between 2019 and 2020. The interest rate on the line of credit adjusts quarterly based on three-month LIBOR plus a spread.

The Bank is primarily engaged in business in Cecil and Harford counties. As a result of the severe economic recession nationally and the corresponding downturn in the markets served by the Bank, the Bank's asset values began deteriorating in late 2009. Effective June 29, 2010, the Company and the Bank entered into a written agreement with the Federal Reserve Bank of Richmond (the "Reserve Bank") and the State of Maryland Commissioner of Financial Regulation (the "Commissioner") pursuant to which the Company and the Bank have agreed to take various actions. Under the terms of the Written Agreement, the Bank has agreed to develop and submit for approval written plans to: (1) strengthen board oversight of the management and operations of the Bank; (2) strengthen credit risk management practices; (3) strengthen management of credit concentrations; (4) enhance its lending and credit administration program; (5) provide for the ongoing review and grading of the Bank's loan portfolio by a qualified independent party; (6) improve the Bank's position through repayment, amortization, liquidation, additional collateral, or other means on each loan or other asset in excess of $250,000, including other real estate owned, that is (i) 90 days or more past due as of the date of the Written Agreement, (ii) that is on the Bank's problem loan list, or (iii) that was adversely classified in a report of examination of the Bank; (7) for the use or disposition of real property acquired for Bank premises; (8) provide for the maintenance of an adequate allowance for loan and lease losses; (9) provide for contingent liquidity funding; (10) improve the Bank's earnings and overall condition; and (11) address criticisms in the most recent examination report including

independent testing for BSA/AML compliance.  Under the agreement, both the Company and the Bank have agreed to submit capital plans to maintain sufficient capital at the Company, on a consolidated basis, and at the Bank, on a stand-alone basis, and to refrain from declaring or paying dividends without prior regulatory approval.  The Company has agreed that it will not take any other form of payment representing a reduction in the Bank's capital or make any distributions of interest, principal, or other sums on subordinated debentures or trust preferred securities without prior regulatory approval.  The Company may not incur, increase, or guarantee any debt without prior regulatory approval and has agreed not to purchase or redeem any shares of its stock without prior regulatory approval.

On August 7, 2015 a Prompt Corrective Action Directive (the "Directive") was issued to the Bank by the Board of Governors of the Federal Reserve System.  The Directive requires the Bank, among other things, to (1) increase its capital accounts to the "Adequately Capitalized" category, or (2) enter into and close a contract that will result in the Bank being acquired by another depository institution.  The Directive prohibits the Bank from accepting any brokered deposits.  Further, the Directive sets a ninety-day time limit, subject to extension, to accomplish one of the two above alternatives.

Since the entry of the Directive, the Debtor has been engaged in an effort to secure additional capital to meet the regulatory thresholds.  The failure to meet those requirements could result in the regulators taking additional actions against the Bank.  Absent conformance to the terms of the Directive, the Debtor and the Bank are prohibited from making any payment of subordinated debt principal or interest without regulatory approval.

During the entire time period from the entry of the Directive to the present, the Debtor and the Bank have been diligently pursuing alternative solutions to meet the required capital ratios and otherwise satisfy the obligations of the Directive.  These alternatives have included raising outside capital with the assistance of the Debtor's legal and financial advisors. The Debtor has also focused its efforts on improving the overall financial performance and efficiency of the Bank.

### E. Proposed Recapitalization Transaction and Auction Alternative

The Debtor has recently been successful in attracting $30 million in capital commitments from a group of investors.  The Debtor has binding subscription agreements for over 80% of these funds and expects to have the balance of the agreements as of the time of confirmation. The investment group includes certain officers and directors of the Bank.

The proposed investment is contingent upon the preservation of certain deferred tax assets of the Debtor.  The investment will provide the Debtor with sufficient capital to meet the requirements of the Directive and to fund the distribution to the TruPS Claims.

Prior to the Petition date, the Debtor entered into negotiations with the beneficial interest holders of the TruPS Claims and subsequently entered into a written Plan Support Agreement. As part of these negotiations and to test the expected return from the new investment against the market for the bank stock, the Debtor  agreed to conduct an auction of the bank stock as part of

19

the proposed confirmation process.   The Debtor has engaged Teneo Securities, Inc. to assist in marketing the bank stock and conducting an auction of the stock as part of the confirmation process.   The Debtor will seek the entry of orders from the Bankruptcy Court authorizing the use of certain bidding procedures as part of this process and will conduct an auction of the Bank stock for any interested bidders.

To the extent the auction process yields a return for the TruPS Claims greater than $1 million, the Debtor will complete a sale transaction with the highest bidder.

## IV. TIMING OF THE CHAPTER 11 CASE

The Debtor has no debtor-in-possession financing and limited cash available. The Debtor therefore does not expect the Chapter 11 Case to be protracted. **In fact, the Debtor will request that the Bankruptcy Court confirm the Plan as early as the Bankruptcy Court will allow and is practicable.** The Plan provides that the Effective Date will be the first Business Day (i) on which all conditions to the Plan's confirmation in Article VIII of the Plan have been satisfied and (ii) that is the date on which the Plan is consummated. *See* "The Plan – Conditions Precedent to the Plan's Confirmation and Effective Date" below.

The Debtor believes it is important that the length of its stay in Chapter 11 be as short as practicable. One reason is that Chapter 11 poses serious risks to banking businesses such as the Debtor's, which is affected by the public's and government agencies' confidence in the Debtor's financial stability and ability to perform services and obligations going forward. It therefore is critical that the restructuring and recapitalization contemplated by the Plan be effectuated as expeditiously as possible.

## V. THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS, INTERESTS, AND WARRANTS UNDER THE PLAN. IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.

THE SUMMARIES OF THE PLAN AND OF OTHER DOCUMENTS REFERRED TO HEREIN DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL OF THE TERMS AND PROVISIONS OF THOSE DOCUMENTS, AND REFERENCE IS MADE TO THE PLAN AND THE OTHER DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF THEIR TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST, INTERESTS IN, AND WARRANTS RELATING TO THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, INTERESTS IN, AND WARRANTS RELATING TO THE DEBTOR AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE

DOCUMENT, THE TERMS OF THE PLAN OR THE OTHER OPERATIVE DOCUMENT, AS APPLICABLE, WILL CONTROL.

### A. Overall Structure of the Plan

Under the Plan, Claims against, Interests in, and Warrants relating to the Debtor are divided into Classes according to their relative seniority and other criteria.

### B. Classification and Treatment of Claims, Interests, and Warrants

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and interest holders. In accordance with section 1123, the Plan divides Claims, Interests, and Warrants into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims which, pursuant to section 1123(a)(1), need not be and have not been classified). Under section 1122 of the Bankruptcy Code, the Debtor is required to classify Claims against, Interests in, and Warrants relating to the Debtor into Classes which contain Claims, Interests, and Warrants that are substantially similar to the other Claims, Interests, and Warrants in such Class.

The Debtor believes that the Plan has classified all Claims, Interests, and Warrants in compliance with the provisions of section 1122; however, it is possible that a holder of a Claim, an Interest, or a Warrant may challenge the Debtor's classification of Claims, Interests, and Warrants and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtor intends, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of a Claim, Interest, or Warrant after approval of the Plan could necessitate a re-solicitation of acceptances of the Plan.

### 1. Unclassified Claims

#### (a) Administrative Claims

Administrative Claims are Claims for payment of an administrative expense of a kind specified in section 503(b) or section 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including (a) actual, necessary costs and expenses of preserving the Debtor's Estate and operating its business, including wages, salaries, or commissions for services rendered, and (b) all fees and charges assessed against the Estate under chapter 123 of title 28, United States Code. The rights of each holder of an Administrative Claim shall be Reinstated under, and shall not be Impaired by, the Plan. Each holder of an Administrative Claim shall receive Cash equal to the unpaid portion of its Administrative Claim on the date on which its Administrative Claim becomes payable under applicable law or any agreement relating thereto.

Given that most of the business of the Debtor's corporate enterprise is conducted by its subsidiary, Cecil Bank,  the Debtor expects the Administrative Claims will comprise mostly professional fees and expenses and, in any case, be relatively minimal. The Debtor will satisfy the Administrative Claims in full in the ordinary course of business and in accordance with the Plan.

Any requests for payment of Administrative Claims, with the exception of Administrative Claims for Indenture Trustee Fees which are addressed below,  must be filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order no later than the Administrative Claims Bar Date. Holders of such Administrative Claims that do not file and serve a request for payment of Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor, the Reorganized Debtor, the Estate, or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Any objections to requests for payment of such Administrative Claims must be filed and served on the requesting party within thirty-five (35) days after the Administrative Claims Bar Date. Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice to the Reorganized Debtor.

(b) Priority Tax Claims

Priority Tax Claims are a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code. The rights of each holder of a Priority Tax Claim shall be Reinstated under, and shall not be Impaired by, the Plan. Each holder of a Priority Tax Claim shall receive Cash equal to the unpaid portion of its Priority Tax Claim on the date on which its Priority Tax Claim becomes payable under applicable law or any agreement relating thereto.

(c) Professional Fees

Except as otherwise provided herein or in the Plan, each professional requesting compensation and/or expense reimbursement pursuant to sections 330, 331, or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Case prior to the Effective Date shall file with the Bankruptcy Court an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Case on or before the 35th day following the Effective Date. Without limiting the foregoing, the Reorganized Debtor may pay the charges incurred by the Reorganized Debtor on and after the Confirmation Date for any professional's fees, disbursements, expenses, or related support services, without application to or approval by the Bankruptcy Court.

## 2. Classified Claims, Interests, and Warrants

(a) Class 1 – TruPS Claims.

On or as soon as practicable after the Effective Date, the Debtor shall distribute to each holder of an Allowed Claim in Class 1, in full and final satisfaction of such Allowed Claim, its pro rata share of the greater of; a)  $1,000,000; or b) the Auction Proceeds.

The Debtor, as holder of the Common Securities, shall either waive its right to a

22

Distribution under the Plan with respect to such securities or such distributions shall be made to the holders of the Trust Preferred Securities.  For the avoidance of doubt, all distributions on account of the Trust Junior Subordinated Debentures shall be distributed by the Trusts to the holders of the Trust Preferred Securities.  The TruPS Claims shall be Allowed in the aggregate amount of $21,650,000 , consisting of (a) $17,527,000 representing the principal amount issued pursuant the TruPS Documents and (b) $4,123,735 representing accrued but unpaid interest as of the Petition Date at the applicable rates specified in the TruPS Documents, as well as other fees and costs associated therewith, and shall not be subject to objection, challenge, reduction, offset, avoidance, setoff, recharacterization, impairment, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense or disallowance under applicable law.

Class 1 is Impaired and, therefore, holders of Class 1 Claims are entitled to vote to accept or reject the Plan.

(b) Class 2 - Secured Claims

Secured Claims are secured claims against the Debtor. Class 2 is not Impaired by the Plan. On the Effective Date, each holder of an Allowed Secured Claim shall have its claim Reinstated, and shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Secured Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed Secured Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing. Each holder of a Secured Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(c) Class 3 -Other Priority Claims

Other Priority Claims are Claims entitled to priority under section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim. Class 3 is not Impaired by the Plan. On the Effective Date, each holder of an Allowed Other Priority Claim shall have its claim Reinstated, and shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed Other Priority Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing. Each holder of an Other Priority Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(d) Class 4 -General Unsecured Claims

General Unsecured Claims are Claims that are not an Administrative Claim,  Secured Claim, TruPS Claim, or Other Priority Tax Claim. Class 4 is not Impaired by the Plan.  On the Effective Date, each holder of an Allowed General Unsecured Claim shall have its claim Reinstated, and shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed General Unsecured Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing. Each holder of an Allowed General Unsecured Claim is

not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

Given that the majority of the Debtor's operating expenses are satisfied by Cecil Bank, the Debtor has few, if any, creditors other than the TruPS. To the extent that the Debtor has any non-TruPS creditors, the Debtor will satisfy the applicable General Unsecured Claims in full in the ordinary course of business and in accordance with the Plan.

(e) Class 5 – TARP Interests

The TARP Interests were created as part of the Troubled Asset Relief Program ("TARP") Capital Purchase Program.  The Company sold 11,560 shares of fixed rate cumulative perpetual preferred stock, series A, and a warrant to purchase 523,076 shares (after adjusting for the 2-for-1 stock split approved by the Board of Directors in May 2011) of the Company's common stock to the United States Department of the Treasury for an aggregate purchase price of $11.560 million in cash, with $37,000 in offering costs, and net proceeds of $11.523 million. The preferred stock and the warrant were issued in a private placement exempt from registration pursuant to Section 4(2) of the Securities Act of 1933, as amended.  As of March 31, 2017, the Debtor had outstanding principal indebtedness totaling $11,560,000 attributable to the TARP Preferred Stock, and accrued and unpaid dividends and interest attributable to the TARP Preferred Stock of approximately $5,940,964.

As part of the New Investment, the Debtor will redeem the TARP Interests and issue 22 million shares of common stock with a par value of $0.04 per to the United States Treasury under the Plan.   The Debtor will then cause those shares to be exchanged as part of the New Investment and issued to the New Investors for payment of $880,000 to Treasury.

(f) Class 6 – Series B Interests

Series B Interests are certain common stock holdings of so-called Series B Investors Charles Sposato,  Fair Family,  Phillip E. Klein Non-Exempt Family Trust, First Mariner Bank, Shri Sai Hotel Consultant, LFB Investments, LLC and Mary Halsey.  On the Effective Date, all Series B Interests will be cancelled and no distribution will be made to any Class 6 member. Class 6 has been deemed to reject the Plan and the Debtor will not solicit votes on the Plan from the holders of Class 6 Claims.

(g) Class 7 –  Common Stock Interests

The Common Stock Interests are those common stock holdings other than the Series B Interests.  On the Closing Date, all Common Stock Interests will be cancelled and no distribution will be made to any Class 7 member.  Class 7 has been deemed to reject the Plan and the Debtor will not solicit votes on the Plan from the holders of Class 7 Claims.

(f) Class 8 – Warrants

Warrants are any warrant, option, or other contractual right (including any rights under registration agreements or equity incentive agreements) to purchase or acquire any equity interest in the Debtor as defined in section 101(16) of the Bankruptcy Code, at any time, and all rights

arising with respect to such warrants, options, or contractual rights. Class 8 is Impaired by the Plan. All Warrants, including, without limitation, all outstanding stock options, will be cancelled. Each holder of an Allowed Warrant shall be deemed to reject the Plan and their votes will not be solicited.

### 3. Full Satisfaction

The Reorganized Debtor shall make, and each holder of a Claim, Interest, or Warrant shall receive, the distributions or treatment provided for in the provisions of Article III of the Plan in full and final satisfaction, settlement, release, and discharge of, and in exchange for, all Claims against, Interests in, and Warrants relating to the Debtor.

### 4. Alternative Treatment

Notwithstanding any provision in the Plan to the contrary, consistent with section 1123(a)(4) of the Bankruptcy Code, any holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled under the Plan, any other distribution or treatment to which it and the Debtor may agree in writing.

### C. Means for Implementation of the Plan

### 1. Continued Corporate Existence

The Reorganized Debtor shall continue to exist as a corporate entity under its articles of incorporation and bylaws in effect before the Effective Date, except as its articles of incorporation and bylaws are amended by the Plan.

### 2. Articles of Incorporation and Bylaws

The articles of incorporation of the Reorganized Debtor will be amended to permit the distributions to be made under the terms of the Plan and the New Investment and to satisfy the provisions of the Bankruptcy Code.

### 3. Sources of Consideration for Plan Distributions

(a) New Investment

On the Effective Date, the Debtor will receive certain cash consideration from the New Investors in the form of the New Investment, and the New Investment will be utilized (a) to make payments required to be made under the Plan, (b) to recapitalize the Debtor's subsidiary, the Bank, and (c) in the Reorganized Debtor's operations.

The Debtor shall be deemed to have assumed the Investment Agreements as of the Effective Date. To the extent that that the Debtor has entered into Investment Agreements post-petition subject to confirmation of the Plan, such post-petition Investment Agreement shall be approved, and the Debtor shall be authorized to perform thereunder, as of the Effective Date.

Certain continuing directors and officers of the Debtor and/or Cecil Bank may participate

in the New Investment. Such insiders will be participating at the same pricing and will be subject to the same restrictions on trading that apply to the largest among the New Investors. Independent directors of the Debtor who are not participating in the New Investment have reviewed these potential insider investments in the context of their consideration of approval of the transactions contemplated by the Plan.

(b) New Common Stock

On the Closing Date, the Reorganized Debtor shall issue 750,000,000 shares of Common Stock to the New Investors on account of the New Investment in accordance with the terms of the Investment Agreements. All the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and nonassessable.

### 4. Restructuring Transactions

Prior to, on, or after the Effective Date, and pursuant to the Plan, the Debtor and/or the Reorganized Debtor shall enter into the restructuring transactions described herein and in the Plan and any ancillary documents.   The Restructuring will take place as follows:

On the Effective Date:

1.      Cancel all Series B Interests;

On the Closing Date (one day after the Effective Date):

2.      Issue the New Common Stock;

3.      Cancel all Common Stock Interests;

4.      Issue the Exchange Shares;

5.      Convey the New Common Stock and the Exchange Shares to the New Investors; and

6.      Repurchase the TruPS Securities.

 The Debtor and/or the Reorganized Debtor shall take any  additional actions as may be necessary or appropriate to effect a restructuring of the Debtor's business or the overall organizational structure of the Reorganized Debtor. The restructuring transactions may include one or more restructurings, conversions, or transfers as may be determined by the Debtor to be necessary or appropriate. The actions taken by the Debtor and/or the Reorganized Debtor to effect the restructuring transactions may include: (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, or transfer containing terms that are consistent with the terms of the Plan, the Disclosure Statement, and any ancillary documents and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Disclosure Statement, and any ancillary documents and having other terms for which the applicable parties may agree; (iii) the filing of

appropriate certificates or articles of incorporation, reincorporation, or conversion pursuant to applicable state law, including but not limited to the articles of incorporation and bylaws; (iv) the cancellation of shares and Warrants; and (v) all other actions that the Debtor and/or the Reorganized Debtor determines to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the restructuring transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the restructuring transactions.

Without limiting the generality of the foregoing, the Debtor is authorized to amend and restate the articles of incorporation in order to, among other things, (A) adopt certain restrictions on acquisitions and dispositions of securities and (B) make certain other changes consistent with the Plan.

The chairman of the board of directors, president, chief executive officer, chief financial officer, any executive vice-president or senior vice-president, or any other appropriate officer of the Debtor and of the Reorganized Debtor, as the case may be, shall each be authorized to execute, deliver, file, or record any such agreements, instruments, or documents referenced in the Plan, including but not limited to those items referenced in Article IV of the Plan, and shall each be further authorized to take such other actions as may be necessary, desirable, or appropriate to effectuate and further evidence the terms and conditions of the Plan and the restructuring transactions contemplated in the Plan. The secretary or assistant secretary of the Debtor and of the Reorganized Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

### 5. Cancellation of Securities

The Plan provides that on and after the Effective Date, except to the extent otherwise provided therein, all indentures, notes, bonds, instruments, guarantees, certificates, agreements (including registration rights agreements), and other documents evidencing the existing preferred, common, and/or other stock of the Debtor, including but not limited to Warrants, will be cancelled, and any obligations of the Debtor there under or in any way related thereto shall be fully satisfied, released, and discharged except as otherwise provided for by the Plan.

On or after the Effective Date, all duties and responsibilities of the Indenture Trustees under the Indentures shall be discharged except to the extent required in order to effectuate the Plan.

### 6. Section 1145 Exemption

The issuance of the New Common Stock, under the terms of the Plan, to holders of Allowed Claims and Interests on account of their Allowed Claims and Interests shall be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any person, unless required by the provision of the relevant corporate documents or applicable law, regulation, order or rule, and shall thereby be exempt from the requirements of Section 5 of the Securities Act of 1933, as amended, and any state or local laws requiring registration for the offer and sale of a security; and all documents evidencing the same shall be executed and delivered as provided for in the Plan or related documents.

### 7. Directors and Officers

On the Effective Date, the board of directors of the Reorganized Debtor shall be comprised of the three individuals who currently serve on the board of directors and additional individuals participating in the New Investment .  If an investor-selected director has not received requisite regulatory approval or non-objection prior to the Effective Date, then such investor-selected director shall become a director as soon as practicable upon receipt of such approval. In the absence of such approval with respect to an investor-selected director or a vacancy in any director position, the applicable director position will be filled in accordance with the Reorganized Debtor's bylaws. The officers of the Debtor shall continue as officers of the Reorganized Debtor. The Reorganized Debtor's directors and officers will receive compensation consistent with the Reorganized Debtor's policies and practices.

Certain continuing directors and officers of the Debtor and/or Cecil Bank may be participating in the New Investment. Such insiders will be participating at the same pricing and will be subject to the same restrictions on trading that apply to the largest among the New Investors. Independent directors of the Debtor who are not participating in the New Investment have reviewed these potential insider investments in the context of their consideration of approval of the transactions contemplated by the Plan.

### 8. Revesting of Assets

The property of the Debtor's Estate, together with any property of the Debtor that is not property of the Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Claims, Interests, and Warrants, except as specifically provided in the Plan or the Confirmation Order. Without limiting the generality of the foregoing, the Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay professional fees and expenses incurred after the Confirmation Date.

### 9. Preservation of Rights of Action

Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights or causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or the Estate may hold against any Person or entity. The Reorganized Debtor or its successor(s) may pursue such retained claims, rights or causes of action, suits, or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtor or its successor(s) who hold such rights. Notwithstanding the foregoing, the Debtor hereby releases any claims, causes of action, or rights arising under sections 510(c), 544, 545, 547, 548, 549, 550, and 551 of the Bankruptcy Code.

### 10. Exemption from Certain Transfer Taxes

28

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers or mortgages from or by the Debtor to the Reorganized Debtor or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### D. Provisions Governing Distributions

### 1. Delivery of Distributions; Undeliverable or Unclaimed Distributions

(a) Delivery of Distributions in General

The Reorganized Debtor shall make distributions to each holder of an Allowed Claim and an Allowed Interest at the address for each such holder reflected in the books and records of the Debtor. Distributions under the Plan shall be made only to the holders of Allowed Claims and Allowed Interests as of the Record Date.

(b) Undeliverable and Unclaimed Distributions

(i) Holding of Undeliverable and Unclaimed Distributions

If any holder's distribution is returned as undeliverable, no further distributions to that holder shall be made unless and until the Reorganized Debtor receives notice of the holder's then-current address, at which time all outstanding distributions shall be made to the holder. Undeliverable distributions made through the Reorganized Debtor shall be returned to the Reorganized Debtor until such distributions are claimed. The Reorganized Debtor shall establish a segregated account to serve as the unclaimed distribution reserve, and all undeliverable and unclaimed distributions shall be deposited therein, for the benefit of all similarly situated Persons until such time as a distribution becomes deliverable, is claimed, or is forfeited under the terms of the Plan.

(ii) Failure to Claim Undeliverable Distributions

Any undeliverable or unclaimed distribution under the Plan that does not become deliverable on or before the second anniversary of the Effective Date shall be deemed to have been forfeited and waived, and the Person otherwise entitled thereto shall be forever barred and enjoined from asserting its Claim therefor against, or seeking to recover its distribution from, the Debtor, the Estate, the Reorganized Debtor, or their property. After the second anniversary of the Effective Date, the Reorganized Debtor shall withdraw any amounts remaining in the unclaimed distribution reserve for distribution in accordance with the Plan.

### 2. Calculation Of Distribution Amounts Of New Common Stock

No fractional shares of New Common Stock shall be issued or distributed under the Plan or by the Reorganized Debtor. Each Person entitled to receive New Common Stock will receive the total number of whole shares of New Common Stock to which such Person is

entitled.

### 3. Withholding and Reporting Requirements

In connection with the Plan and all distributions hereunder, the Reorganized Debtor shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to those requirements. The Reorganized Debtor shall be authorized to take all actions necessary or appropriate to comply with those withholding and reporting requirements. Notwithstanding any other provision of the Plan, (i) each holder of an Allowed Claim that is to receive a distribution of its pro rata share of New Common Stock shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (ii) no distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtor for the payment and satisfaction of such tax obligations or has, to the Reorganized Debtor's satisfaction, established an exemption therefrom. Any distribution of shares of New Common Stock to be made pursuant to the Plan shall, pending the implementation of such arrangements, be treated as undeliverable pursuant to Article V thereof.

### 4. Setoffs

The Reorganized Debtor may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made in respect of that Claim, claims of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the Claim's holder, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any claim that the Debtor or the Reorganized Debtor may have in connection with such Claim.

### E. Treatment of Executory Contracts and Unexpired Leases

### 1. Assumed Contracts and Leases

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Reorganized Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party unless such Executory Contract (other than the Investment Agreements) or Unexpired Lease: (1) was assumed or rejected previously by the Debtor; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is otherwise identified as an Executory Contract or Unexpired Lease to be rejected before the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365 of the Bankruptcy Code approving the Executory Contract and Unexpired Lease assumptions as of the Effective Date.

All Assumed Agreements shall remain in full force and effect for the benefit of the Reorganized Debtor, and be enforceable by the Reorganized Debtor in accordance with their terms notwithstanding any provision in such Assumed Agreement that prohibits, restricts or

conditions such assumption, assignment or transfer. Any provision in the Assumed Agreements that purports to declare a breach or default based in whole or in part on commencement or continuance of this Chapter 11 Case is hereby deemed unenforceable, and the Assumed Agreements shall remain in full force and effect. Any provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtor based on the filing of the Chapter 11 Case or the financial condition of the Debtor shall be unenforceable.

The Debtor shall be deemed to have assumed the Investment Agreements as of the Effective Date. To the extent that that the Debtor has entered into Investment Agreements post petition subject to confirmation of the Plan, the Debtor shall be authorized to perform under such post petition Investment Agreement as of the Effective Date.

The Debtor shall be deemed to have assumed its engagements with Keefe Bruyette & Woods, Inc. and Holdco Advisors, L.P. as discussed below.

### 2. Payments Related to Assumption of Contracts and Leases

Any monetary amounts by which any executory contract and unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure in the ordinary course of business.

### 3. Indemnification Obligations

Except as otherwise specifically provided in the Plan, any obligations or rights of the Debtor to indemnify its present and former directors, officers, or employees under its articles of incorporation, bylaws, or employee-indemnification policy, or under state law or any agreement with respect to any claim, demand, suit, cause of action, or proceeding, shall survive and be unaffected by the Plan's confirmation, and remain an obligation of the Reorganized Debtor, regardless of whether the right to indemnification arose before or after the Petition Date.

### 4. Treatment of Change of Control Provisions

The entry of the Confirmation Order, consummation of the Plan, and/or any other acts taken to implement the Plan shall not constitute a "change in control" under any provision of any contract, agreement or other document which provides for the occurrence of any event, the granting of any right, or any other change in the then-existing relationship between the parties upon a change in control of the Debtor.

### F. Conditions Precedent to the Plan's Confirmation and Effective Date

### 1. Conditions to Confirmation

The Plan's Confirmation is subject to the satisfaction of the following conditions precedent:

a) The proposed Confirmation Order shall be in a form and substance satisfactory to the Debtor.

b) The Debtor shall have entered into additional subscriptions agreements with

additional New Investors providing additional New Investment totaling not less than
$30 million, or such lesser amount acceptable to the Debtor.

### 2. Conditions to Effective Date

Effectiveness of the Plan is subject to the satisfaction of each of the following conditions
precedent:

a) Each of the conditions to entry of the Confirmation Order shall have been satisfied.

b) The Bankruptcy Court shall have entered the Confirmation Order, in form and
substance reasonably satisfactory to the Debtor, confirming the Plan, as the same may
have been modified.

c) The Debtor shall have consummated the transactions contemplated by the Investment
Agreements to be consummated on or prior to the Effective Date.

d) The Debtor shall have received all required regulatory approvals to consummate the
transactions contemplated by the Investment Agreements and in the Plan, the
Disclosure Statement, and any related ancillary documents

### G. Modification; Withdrawal

The Debtor reserves the right to modify the Plan either before or after Confirmation to
the fullest extent permitted under section 1127 of the Bankruptcy Code and Bankruptcy Rule
3019. The Debtor may withdraw the Plan at any time before the Effective Date.

### H. Retention of Jurisdiction

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the Plan's
Confirmation and the occurrence of the Effective Date, the Bankruptcy Court shall retain
exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Case and the
Plan, to the fullest extent permitted by law, including jurisdiction to

1. Enter such orders as may be necessary or appropriate to execute, implement, or consummate
the provisions of the Plan and all contracts, instruments, releases, and other agreements or
documents created in connection with the Plan, the Disclosure Statement, or the
Confirmation Order;

2. Hear and determine disputes arising in connection with the interpretation, implementation,
consummation, or enforcement of the Plan and all contracts, instruments, and other
agreements executed in connection with the Plan;

3. Hear and determine any request to modify the Plan or to cure any defect or omission or
reconcile any inconsistency in the Plan or any order of the Bankruptcy Court;

4. Issue and enforce injunctions or other orders, or take any other action that may be necessary
or appropriate to restrain any interference with the implementation, consummation, or
enforcement of the Plan or the Confirmation Order;

5. Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

6. Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

7. Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

8. Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

9. Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b), and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the Effective Date the payment of fees and expenses of the Reorganized Debtors, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; and

10. Enter a final decree closing the Chapter 11 Case.

## I. Effects of Confirmation

### 1. Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtor, all present and former holders of Claims, Interests, and Warrants, and their respective successors and assigns, and all other parties in interest in this Chapter 11 Case.

### 2. Discharge of the Debtor

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Interests, Warrants, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, Interests in, or Warrants relating to, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, Interests, or Warrants, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (1) a proof of claim or interest based upon such Claim, debt, right, Interest, or Warrant is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim, Interest, or Warrant based upon such Claim, debt, right, Interest, or Warrant is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim, Interest, or Warrant has accepted the Plan. Except as otherwise

provided in the Plan, any default by the Debtor with respect to any Claim, Interest, or Warrant that existed before or on account of the filing of the Chapter 11 Case shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims, Interests, and Warrants subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

### 3. Exculpation and Limitation of Liability

As of the Effective Date, except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, cause of action, or liability for any Exculpated Claim, except for any act or omission that is determined in a Final Order to have constituted gross negligence, intentional fraud, or willful misconduct, but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtor and the Reorganized Debtor (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding any provision of this Article or the Plan, the Plan shall not effect a release, discharge, exculpation, injunction against the exercise of, or other impairment or extinction of (i) any rights or claims of the New Investors or the Debtor under the Investment Agreements or (ii) any claims by the United States Government or any of its agencies, or any state or local authority, including, without limitation, any claim arising under applicable securities or banking laws or regulations.

### 4. Releases by Debtor

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code and to the extent allowed by applicable law, on the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtor and the implementation of the restructuring contemplated in the Plan, the Debtor shall provide a full discharge and release to each Released Party (and each such Released Party so released shall be deemed fully released and discharged by the Debtor) and their respective properties from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing as of the Effective Date in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtor, including, without limitation, those Causes of Action that the Debtor or the Reorganized Debtor would have been legally entitled to assert in its own right or that any holder of a Claim, an Interest, or a Warrant or other entity would have been legally entitled to assert on behalf of the Debtor or its Estate, and further including those Causes of Action in any way related to the Chapter 11 Case or the Plan; provided, however, that the foregoing release shall not operate to

34

waive or release any Causes of Action of the Debtor arising from claims for gross negligence, intentional fraud, or willful misconduct by a Released Party.

Notwithstanding any provision of this Article or the Plan, the Plan shall not effect a release, discharge, exculpation, injunction against the exercise of, or other impairment or extinction of any rights or claims of the New Investors or the Debtor under the Investment Agreements.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing releases by the Debtor, and further, shall constitute the Bankruptcy Court's finding that the foregoing releases are: (i) in exchange for good and valuable consideration provided by the Released Parties, a good faith settlement, and compromise of the Claims released by such release; (ii) in the best interests of the Debtor and all holders of Claims, Interests, and Warrants; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to the Debtor or the Reorganized Debtor asserting any Claim released by such release against any of the Released Parties.

### 5. Injunction

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, OR WARRANTS THAT HAVE BEEN DISCHARGED PURSUANT TO ARTICLE XI.B OF THE PLAN, RELEASED PURSUANT TO ARTICLE XI.D OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE XI.C OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR WARRANTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR WARRANTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR WARRANTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR WARRANTS RELEASED, SETTLED, OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS, INTERESTS, AND WARRANTS IN THE PLAN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS, INTERESTS, AND WARRANTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTOR OR ANY

OF ITS ASSETS, PROPERTY, OR ESTATE. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, ALL SUCH CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED ON THE EFFECTIVE DATE, AND THE INTERESTS AND WARRANTS WILL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED FROM AND AFTER THE EFFECTIVE DATE, AND ALL INTERESTS AND WARRANTS WILL BE CANCELLED, AND THE DEBTOR'S LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502 OF THE BANKRUPTCY CODE. ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTOR, THE DEBTOR'S ESTATE, THE REORGANIZED DEBTOR, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY CLAIMS, INTERESTS, OR WARRANTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

### J. Miscellaneous Provisions

#### 1. Payment of Statutory Fees

All fees payable under Section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Case shall be paid from funds otherwise available for distribution hereunder.

#### 2. Severability of Plan Provisions

If, before Confirmation, the Bankruptcy Court holds that any provision of the Plan is invalid, void, or unenforceable, the Debtor, at its option, may amend or modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been amended or modified in accordance with the foregoing, is valid and enforceable.

#### 3. Successors and Assigns

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of that Person.

#### 4. Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case, either by virtue of sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until the

Reorganized Debtor has made all distributions contemplated by the Plan and the Bankruptcy Court has entered an order closing the Chapter 11 Case.

### 5. Payment of Advisory Fees and Expense Reimbursement Due in Connection with New Investment

The Bank is a party to certain engagement agreements with The Hovde Group ("Hovde") which is the placement agent and/or financial advisor to Cecil Bank and/or their respective boards of directors. The applicable fees and expense reimbursement due to Hovde shall be paid without any need for further Bankruptcy Court approval and as an Allowed Administrative Claim.

The Debtor shall be deemed to have assumed its engagement agreements with Hovde as of the Effective Date.

Hovde specializes in the recapitalization of financial institutions, and has been invaluable to the Debtor in connection with raising the capital necessary to consummate the transactions contemplated by the Plan. In addition, the Debtor understands that the fees and other charges payable to Hovde at closing are consistent with the market and are therefore reasonable, particularly where, as here, they are only payable at the closing or the Effective Date under the Plan.

The Debtor is a party to a written services agreement entered into as of May 18, 2017 with Teneo Securities, Inc. ("Teneo"). The terms of the agreement provide that the Debtor will pay Teneo monthly fees of $40,000 and an additional success fee equal to seven percent (7%) of any distribution to the TruPS Claims in excess of $1,000,000 arising out of the consummation of an alternative transaction.

The Debtor shall be deemed to have assumed its engagement agreement with Teneo as of the Effective Date.

### K. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), (i) the laws of the State of Maryland shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan and (ii) the laws of the state of incorporation of the Debtor shall govern corporate governance matters with respect to the Debtor, in either case without giving effect to the principles of conflicts of law thereof.

## VI. CERTAIN RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), including the "Risk Factors" and other matters discussed in the Financial Statements attached hereto, before deciding whether to vote to accept or to reject the Plan.

### A. Failure to Confirm the Plan

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be converted to Chapter 7 for liquidation. In fact, the Debtor believes that, absent confirmation of the Plan, the likely result may be liquidation. In the event of a liquidation, holders of TruPS Claims and all other creditors and stockholders likely would receive nothing. *See* "Alternatives to Confirmation and Consummation of the Plan."

### B. Potential Adverse Effects of Chapter 11

While the Debtor will seek to have the stay in Chapter 11 as brief as practicable so as to minimize any potential disruption to its operations, it is possible that, despite the belief and intent of the Debtor, the commencement of the Chapter 11 Case could materially adversely affect relationships between the Debtor and its customers and applicable regulatory agencies and bodies.

### C. Underlying Risks at the Bank Level

1. Potential Credit Quality Decline

The Bank's ability to generate earnings is significantly affected by its ability to properly originate, underwrite and service loans. The Bank has sustained losses primarily because borrowers, guarantors or related parties have failed to perform in accordance with the terms of their loans and the Bank failed to detect or respond to deterioration in asset quality in a timely manner. The Bank could sustain additional losses for these reasons. Further problems with credit quality or asset quality could cause the Bank's interest income and net interest margin to further decrease, which could adversely affect the Bank's business, financial condition and results of operations.

2. Real Estate

A significant portion of the Bank's loan portfolio is secured by real estate. As of March 31, 2017, approximately 98% of the Bank's loans had real estate as a primary or secondary component of collateral. The real estate collateral in each case provides an alternate source of repayment in the event of default by the borrower and may deteriorate in value during the time the credit is extended. Deterioration of the real estate market in the Bank's market areas, could result in an increase in the number of borrowers who default on their loans and a reduction in the value of the collateral securing their loans, which in turn could have an adverse effect on the Bank's profitability and asset quality. If the Bank is required to liquidate the collateral securing a loan to satisfy the debt during a period of reduced real estate values, the Bank's earnings and capital could be adversely affected. Acts of nature, including hurricanes, tornados, earthquakes, fires and floods, each of which may be exacerbated by global climate change and may cause uninsured damage and other loss of value to real estate that secures these loans, may also negatively impact the Bank's financial condition.

3. Allowance for Loan Losses

The Bank's success depends, to a significant extent, on the quality of its assets,

particularly loans. Like other financial institutions, the Bank faces the risk that its customers will not repay their loans, that the collateral securing the payment of those loans may be insufficient to assure repayment, and that the Bank may be unsuccessful in recovering the remaining loan balances. The risk of loss varies with, among other things, general economic conditions, the type of loan, the creditworthiness of the borrower over the term of the loan and, for many of the Bank's loans, the value of the real estate and other assets serving as collateral. Management makes various assumptions and judgments about the collectability of the Bank's loan portfolio after considering these and other factors. Based in part on those assumptions and judgments, the Bank maintains an allowance for loan losses in an attempt to cover any loan losses that may occur. In determining the size of the allowance, the Bank also relies on an analysis of its loan portfolio based on historical loss experience, volume and types of loans, trends in classification, delinquencies and nonaccruals, national and local economic conditions and other pertinent information, including the results of external loan reviews. Despite the Bank's efforts, its loan assessment techniques may fail to properly account for potential loan losses, and, as a result, the established loan loss reserves may prove insufficient. If the Bank is unable to generate income to compensate for these losses, they could have a material adverse effect on its operating results.

In addition, federal and state regulators periodically review the Bank's allowance for loan losses and may require it to increase its allowance for loan losses or recognize further loan charge-offs, based on judgments different than those of the Bank's management. Higher charge-off rates and an increase in the Bank's allowance for loan losses may hurt its overall financial performance and may increase its cost of funds. As of March 31, 2017, the Bank had nonaccrual loans totaling approximately $9.3 million, and the allowance for loan loss was $1.3 million. The Bank's current and future allowances for loan losses may not be adequate to cover future loan losses given current and future market conditions.

4.  Liquidity Risks

The goal of liquidity management is to ensure that the Bank can meet customer loan requests, customer deposit maturities and withdrawals, and other cash commitments under both normal operating conditions and under unpredictable circumstances of industry or market stress. To achieve this goal, the Bank's asset/liability committee establishes liquidity guidelines that require sufficient asset-based liquidity to cover potential funding requirements and to avoid over-dependence on volatile, less reliable funding sources.

Liquidity is essential to the Bank's business. An inability to raise funds through traditional deposits, borrowings, the sale of securities or loans, issuance of additional equity securities, and other sources could have a substantial negative impact on the Bank's liquidity. The Bank's access to funding sources in amounts adequate to finance its activities and with terms acceptable to it could be impaired by factors that impact the Bank specifically or the financial services industry in general. Factors that could detrimentally impact access to liquidity sources include a decrease in the level of the Bank's business activity as a result of a downturn in the markets in which the Bank's loans are concentrated, the change in the Bank's status from well-capitalized to significantly undercapitalized, or regulatory action against the Bank. The Bank's ability to borrow could also be impaired by factors that are not specific to it, such as the current disruption in the financial markets and negative views and expectations about the

prospects for the financial services industry as a result of the continuing turmoil and deterioration in the credit markets.

Traditionally, the primary sources of funds of the Bank have been customer deposits and loan repayments. Because of the Directive, the Bank may not accept brokered deposits unless a waiver is granted by the FDIC.

The Bank actively monitors the depository institutions that hold its federal funds sold and due from banks cash balances. The Bank cannot provide assurances that access to its cash and cash equivalents and federal funds sold will not be impacted by adverse conditions in the financial markets. The Bank's emphasis is primarily on safety of principal, and it diversifies cash, due from banks, and federal funds sold among counterparties to minimize exposure relating to any one of these entities. The Bank routinely reviews the financials of its counterparties as part of its risk management process. Balances in the Bank's accounts with financial institutions in the U.S. may exceed the FDIC insurance limits. While the Bank monitors and adjusts the balances in its accounts as appropriate, these balances could be impacted if the correspondent financial institutions fail.

There can be no assurance that the Bank's sources of funds will be adequate for its liquidity needs, and it may be compelled to seek additional sources of financing in the future. Specifically, it may seek additional debt in the future to achieve its business objectives. There can be no assurance that additional borrowings, if sought, would be available to the Bank or, if available, would be on favorable terms. Bank and holding company stock prices have been negatively impacted by the recent adverse economic conditions, as has the ability of banks and holding companies to raise capital or borrow in the debt markets. If additional financing sources are unavailable or not available on reasonable terms, the Bank's business, financial condition, results of operations, cash flows, and future prospects could be materially adversely impacted.

5.      Investment Portfolio

The Bank's investment portfolio as of March 31, 2017 has been designated available-for-sale pursuant to U.S. GAAP relating to accounting for investments. Such principles require that unrealized gains and losses in the estimated fair value of the available-for-sale portfolio be "marked to market" and reflected as a separate item in shareholders' equity (net of tax) as accumulated other comprehensive income. This determination requires significant judgment, and actual results may be materially different than the Bank's estimate. At March 31, 2017, the Bank maintained $50.0 million, or 100% of its total securities, as available-for-sale.

Management believes that several factors will affect the fair value of the Bank's portfolio. These include, but are not limited to, changes in interest rates or expectations of changes, the degree of volatility in the securities markets, inflation rates or expectations of inflation, and the slope of the interest rate yield curve (the yield curve refers to the differences between short-term and longer-term interest rates; a positively sloped yield curve means shorter-term rates are lower than longer-term rates). These and other factors may impact specific categories of the portfolio differently, and the Bank cannot predict the effect these factors may

have on any specific category.  Shareholders' equity will continue to reflect the unrealized gains and losses (net of tax) of these investments.  If conditions in the credit markets deteriorate further, the Bank may be required to record unrealized losses in other comprehensive income (loss) or additional impairment on the Bank's investments in future quarters.

6.      Interest Rate Risk

The Bank's profitability depends to a large extent on its net interest income, which is the difference between income on interest-earning assets such as loans and investment securities, and expense on interest-bearing liabilities such as deposits and other borrowings.  The Bank is unable to predict changes in market interest rates, which are affected by many factors beyond the Bank's control, including inflation, recession, unemployment, money supply, domestic and international events and changes in the United States and other financial markets.  The Bank's net interest income may be reduced if: (i) more interest-earning assets than interest-bearing liabilities reprice or mature during a time when interest rates are declining or (ii) more interest-bearing liabilities than interest-earning assets reprice or mature during a time when interest rates are rising.

Changes in the difference between short- and long-term interest rates may also harm our business.  For example, if short-term and long-term interest rates shrink or disappear, as has occurred in the current interest rate policy environment, the spread between rates paid on deposits and received on loans could narrow significantly, decreasing the Bank's net interest income.

7.      Key Personnel

The Bank's success is, and is expected to remain, highly dependent on its senior management team.  Management's extensive knowledge of the banking industry and relationships in the community generate business for the Bank.  The Bank may not be able to retain members of the senior management team or other key employees.  The loss of the services of any of them could have a material adverse effect on the Bank's business, financial condition and results of operation.

8.      Customer Information

The Bank provides its customers the ability to bank online.  The secure transmission of confidential information over the Internet is a critical element of online banking.  The Bank's network could be vulnerable to unauthorized access, computer viruses, phishing schemes and other security problems.  The Bank may be required to spend significant capital and other resources to protect against the threat of security breaches and computer viruses, or alleviate problems caused by security breaches or viruses.  To the extent that the Bank's activities or the activities of its customers involve the storage and transmission of confidential information, security breaches and viruses  could expose the Bank to claims, litigation and other possible liabilities.  Any inability to prevent security breaches or computer viruses could also cause existing customers to lose confidence in the Bank's system and could adversely affect its reputation and ability to generate deposits.

9.      Litigation Risk

The Debtor and the Bank may be involved from time to time in a variety of litigation, investigations or similar matters arising out of its business.  Insurance may not cover all claims that may be asserted against the Debtor or the Bank, and any claims asserted against the Debtor or the Bank, regardless of merit or eventual outcome, may harm their reputation.  Should the ultimate judgments or settlements in any litigation or investigation significantly exceed insurance coverage, it could have a material adverse effect on the Debtor's and the Bank's business, financial condition and results of operation.

### D. Absence of Public Market; Restriction on Transferability

The shares of common stock to be issued to the holders of Allowed Claims and Interests are securities for which there is no market. Accordingly, there can be no assurance as to the development or liquidity of any market for the shares of the stock. If a trading market does not develop or is not maintained, holders of the shares may experience difficulty in reselling such securities or may be unable to sell them at all. If a market for the shares of the stock develops, any such market may be discontinued at any time.

The shares of the Reorganized Debtor's stock are being offered in reliance upon an exemption from registration under the Securities Act and applicable state securities laws. Therefore, the shares may be transferred or resold only in a transaction registered under or exempt from the Securities Act and applicable state securities laws. The liquidity of, and trading market for, the shares of such stock also may be adversely affected by general declines in the market or by declines in the market for similar securities. Such declines may adversely affect such liquidity and trading markets independent of the financial performance of, and prospect for, the Reorganized Debtor.

### E. Dividends

The Debtor receives substantially all of its revenue from dividends from Cecil Bank. Those dividends are the principal source of funds to pay dividends on the Debtor's common stock and interest and principal on its debt. Various federal and/or state laws and regulations limit the amount of dividends that Cecil Bank and certain of its non-bank subsidiaries may pay the Debtor. If earnings of the Debtor's subsidiaries are not sufficient to make dividend payments to the Debtor while maintaining adequate capital levels, the Debtor's ability to make dividend payments will be negatively impacted.

### F. Regional Concentration

The Debtor's regional concentration puts it particularly at risk for changes in economic conditions in its primary market of Maryland. The Debtors is therefore particularly vulnerable to adverse changes in economic conditions in Maryland.

### G. Regulatory Matters

The effectiveness of the Plan is conditioned on, among other things, the Debtor's receipt of all required regulatory approvals to consummate the transactions contemplated by the Investment Agreements and the Plan, the Disclosure Statement, and any related ancillary documents. The Debtor and Cecil Bank are heavily regulated by federal and state agencies under various programs and regimes. If the Debtor cannot obtain the required approvals, the Plan may fail and the Debtor may be forced to pursue liquidation or other alternatives, in which case the recoveries to stakeholders will almost certainly be less than the recoveries available under the Plan. Moreover, even if the Plan is successful, the inability of the Debtor and/or Cecil Bank to comply on a going-forward basis with, and potential future changes or modifications to, applicable statutes, regulations, and regulatory policies, could adversely affect the Reorganized Debtor's and/or the Bank's operations, including, among other things, limiting the types of financial services and products that may be offered and/or increasing operating costs. In addition, any failure to comply with applicable laws, regulations, and policies, could subject the Debtor and/or Cecil Bank to sanctions, reputational damage, and other harm.

### H. Potential Dilution

The Debtor may need to incur additional debt or equity financing in the future to strengthen its capital position. The Debtor's ability to raise capital, if needed, will depend on, among other things, conditions in the capital markets at that time, which are outside of the Debtor's control and its financial performance.  The Debtor cannot provide assurances that such financing will be available to it on acceptable terms or at all, or if the Debtor does raise more capital that it will not be dilutive to existing shareholders.

If the Debtor determines that it needs to raise more capital, its Board generally has the authority, without action or vote of the shareholders, to issue all or part of any authorized but unissued shares of stock for any corporate purpose, including issuance of equity-based incentives under or outside of the Debtor's equity compensation plans.  Additionally, the Debtor is not restricted from issuing additional common stock or preferred stock, including any securities that are convertible into or exchangeable for, or that represent the right to receive, common stock or preferred stock or any substantially similar securities.  If the Debtor issues preferred stock that has a preference over the common stock with respect to the payment of dividends or upon liquidation, dissolution or winding-up, or if it issues preferred stock with voting rights that dilute the voting power of the common stock, the rights of holders of the common stock could be adversely affected.  Any issuance of additional shares of stock will dilute the percentage ownership interest of the shareholders and may dilute the book value per share of the Debtor's common stock.  Shares the Debtor issues in connection with any such offering will increase the total number of shares and may dilute the economic and voting ownership interest of the Debtor's existing shareholders.

## VII. CONFIRMATION OF THE PLAN

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of Chapter 11, including, among other things, that (a) the Plan properly classifies Claims, Interests, and Warrants, (b) the Plan complies with applicable provisions of the Bankruptcy Code, (c) the Debtor has complied with applicable provisions of the Bankruptcy Code, (d) the Debtor has proposed the Plan in good faith and not by any means

forbidden by law, (e) disclosure of "adequate information" as required by section 1125 of the Bankruptcy Code has been made, (f) the Plan has been accepted by the requisite votes of creditors (except to the extent that "cramdown" is available under section 1129(b) of the Bankruptcy Code), (g) the Plan is in the "best interests" of all holders of Claims, Interests, or Warrants in each Impaired Class, (h) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date, and (i) the Plan provides for the continuation after the Effective Date of any retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time before Confirmation in accordance with sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtor has obligated itself to provide such benefits.

### A. Voting Requirements

Under the Bankruptcy Code, only Classes of Claims, Interests, and Warrants that are "impaired" (as that term is defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is Impaired if the Plan modifies the legal, equitable, or contractual rights of holders of Claims, Interests, or Warrants in the Class (other than by curing defaults and reinstating debt). Under section 1126(f) of the Bankruptcy Code, Classes of Claims, Interests, and Warrants that are Unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan. Under section 1126(g) of the Bankruptcy Code, Classes of Claims, Interests, and Warrants whose holders will not receive or retain any property under the Plan are deemed to have rejected the Plan and are not entitled to vote on the Plan.

An Impaired Class of Claims, Interests, or Warrants shall have accepted the Plan if (i) the holders of at least two-thirds in amount of the Allowed Claims, Allowed Interests, or Allowed Warrants actually voting in the Class have voted to accept the Plan, and (ii) the holders of more than one-half in number of the Allowed Claims, Allowed Interests, or Allowed Warrants actually voting in the Class have voted to accept the Plan, in each case not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

Ballots submitted by holders of Allowed TruPS Claims shall be counted individually and separately.

Only the holders of Claims and Interests as of the Record Date, in the Classes entitled to vote on the Plan, shall be allowed to vote on the Plan. In addition, distributions to be made under the Plan shall be made only to the holders of Allowed Claims and Allowed Interests as of the Record Date.

### B. Feasibility of the Plan

In connection with confirmation of the Plan, section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. This is the so-called "feasibility" test. The Debtor believes that the Reorganized Debtor will be adequately capitalized with the New Investment, to make the payments required under the Plan on the Effective Date or as otherwise contemplated by the Plan, and to maintain operations on a

going-forward basis. Accordingly, the Debtor believes that the Plan complies with the standard of section 1129(a)(11) of the Bankruptcy Code.

The Debtor is a registered bank holding company engaged in the banking business through its wholly owned banking subsidiary, Cecil Bank. As a bank holding company, the Debtor and its non-bank subsidiaries are subject to oversight and regulation by the Board of Governors of the Federal Reserve System and, in certain instances, various federal and state banking authorities. As a Maryland state-chartered nonmember bank, Cecil Bank is also subject to extensive regulation, examination and supervision by the FDIC as its primary federal regulator and, at the state level, by the State of Maryland Commissioner of Financial Regulation. As Cecil Bank's sole shareholder, the Debtor is required to serve as a source of managerial and financial strength for Cecil Bank and oversee its policies and financial resources. Aspects of the Plan are subject to approval or non-objection of one or more of these regulators under federal banking laws or the Consent Order. The principal objectives of the U.S. bank regulatory system are to ensure the safety and soundness of banking institutions, to protect depositors and other customers, and to avoid loss to the FDIC Deposit Insurance Fund. Consummation of the Plan is consistent with these objectives. As part of its ongoing supervisory relationship, the Debtor has been in regular communication with its regulators regarding its efforts to recapitalize and to pursue the Plan. The regulators have not raised any objection, and the Debtor believes that it will be able to obtain the requisite regulatory consents to proceed with consummation of the Plan.

The Debtor will fund its reorganization, recapitalization, and operations using the cash proceeds of the New Investment with respect to which the Debtor holds Investment Agreements, substantially in the forms attached hereto.

### C. Best Interests Test

Even if the Plan were to be accepted by each class of holders of Claims, Interests, and Warrants, the Bankruptcy Code requires a Bankruptcy Court to find that the Plan is in the "best interests" of all holders of Claims or Interests that are impaired by the Plan and that have not accepted the Plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (i) all members of an impaired class of claims or interests have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each impaired class of holders of claims or interests if a debtor were liquidated under Chapter 7, a Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the claims of secured creditors to the extent of the value of their collateral and by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of a liquidation under Chapter 7 of the

Bankruptcy Code would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in the Chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured claims.

Once the bankruptcy court ascertains the recoveries in liquidation of the secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

1. <u>Liquidation Analysis</u>

The sole material asset of the Debtor is its stock in the subsidiary Bank. Given the circumstances set forth in the Consent Order and the level of capitalization at the Bank level, any purchaser of the Bank stock will need to make a substantial capital investment in the Bank. There can be no assurance that FDIC regulators would permit a Chapter 7 Trustee to sell a regulated bank. Given the results of the Debtor's advisors to attract new capital investment to the Bank over the past 3 ½ years, the size of the Bank and the investment opportunity, the historical challenges that led to the Consent Order, the depressed price reflective of a sale in a Chapter 7 proceeding, and the financial information set forth in Exhibits F and G hereto, the Debtor believes that the Bank stock as held by the Debtor would yield no return to TruPS claim holders or equity holders on liquidation.

The Debtor believes that each member of each Class of Claims, Interests, and Warrants will receive at least as much, if not more, under the Plan as they would receive if the Debtor was liquidated in a Chapter 7 case. More specifically, a liquidation of the Debtor would significantly impair recoveries to all stakeholders and clearly is not in the best interests of estate constituencies. The Liquidation Analysis estimates that holders of TruPS Claims and all other creditors and stockholders would receive nothing, in a liquidation. By contrast, under the Plan, the holders of the TruPS Claims will receive a minimum distribution of $1,000,000. Accordingly, it is clear that stakeholders will fare much better under the Plan than in a liquidation. The Plan therefore satisfies the best interests test.

**D. Confirmation Without Acceptance of All Impaired Classes – "Cramdown"**

The Debtor will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and it reserves the right to modify the Plan

to the extent, if any, that confirmation in accordance with section 1129(b) of the Bankruptcy Code requires modification. Under section 1129(b) of the Bankruptcy Code, the Court may confirm a plan over the objection of a rejecting class, if, among other things, (a) at least one impaired class of claims has accepted the plan (not counting the votes of any "insiders" as defined in the Bankruptcy Code) and (b) if the plan "does not discriminate unfairly" against and is "fair and equitable" to each rejecting class.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank. A plan is fair and equitable as to a class of secured claims that rejects the plan if, among other things, the plan provides (a) (i) that the holders of claims in the rejecting class retain the liens securing those claims (whether the property subject to those liens is retained by the debtor or transferred to another entity) to the extent of the allowed amount of such claims and (ii) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (a) or (c) of this paragraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if, among other things, the plan provides that (a) each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (b) no holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides, among other things that (a) each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that no holder of an interest that is junior to the interests of such class will receive or retain under the plan any property on account of such junior interest.

The Debtor's Plan is premised upon the acceptance of the Plan by Class 1 (which comprises the TruPS Claims). Thus, the cramdown provisions of section 1129(b), if Class 1 votes to accept the Plan,  would not apply to this class. Each of the Claims in Class 2 (Secured Claims), Class 3 (Other Priority Claims), and Class 4 (General Unsecured Claims) are Unimpaired under the Plan. Thus, the cramdown provisions of section 1129(b) also do not apply to these classes.

The Debtor will solicit the vote of Class 5 (TARP Interests).

Classes 6, 7 and 8 (Series B Interests, Common Stock Interests and Warrants) are deemed to reject the Plan and, accordingly, the Debtor will seek cramdown under section

1129(b)(2)(C)(ii) of the Bankruptcy Code with respect to Classes 6, 7 and 8. Such cramdown is justified because no junior class of stakeholders will receive any recovery under the Plan. The liquidation analysis would otherwise yield no return for any equity holders.

## VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the realistic alternatives likely will be a liquidation of the Debtor's assets in a liquidation under Chapter 7.

The Debtor does not believe that a traditional Chapter 11 process, under which some different plan is developed and proposed post-petition, is viable. While a more traditional Chapter 11 is not a realistic alternative, the Debtor and its advisors did consider alternative structures. Following a thorough marketing effort by the Debtor's financial advisors, the maximum expression of interest that the Debtor obtained for the sale of Cecil Bank was less than the consideration to be realized under the Plan.

The Debtor believes that absent the infusion of new capital and the completion of the proposed restructuring, Cecil Bank will remain subject to further action by regulators, possibly resulting in the Chapter 7 liquidation of the Debtor. The Debtor believes that, in a liquidation under Chapter 7, before creditors would receive any distributions, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtor's Estate. The assets available for distribution to creditors would be reduced by such additional expenses, as well as by certain Claims that may be entitled to priority in the context of a liquidation and/or might arise by reason of the liquidation.

**THE DEBTOR THEREFORE BELIEVES THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO CREDITORS THAN WOULD ANY OTHER ALTERNATIVE AND THAT IT SHOULD BE CONFIRMED PROMPTLY.**

## IX. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS OR INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS OR INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A summary description of certain United States federal income tax consequences of the Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist

with respect to various tax consequences of the Plan as discussed herein. Only United States federal income tax consequences of the Plan to the Debtor and certain holders of Claims or Interests are described below. Except as described below, no opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the Internal Revenue Service ("IRS") or any other tax authorities have been or will be sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any holder of a Claim or Interest. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan to Non-U.S. Holders (as defined below) and all aspects of United States federal income taxation applicable to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders of Claims or Interests who are, or who hold their Claims or Interests through, pass-through entities, persons whose functional currency is not the United States dollar, dealers in securities or foreign currency, persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction and persons who acquired their Claims or Interests pursuant to the exercise of employee stock options or otherwise as compensation). The following discussion assumes that holders of Claims or Interests (other than Allowed Bank Secured Claims) hold their Claims or Interests as capital assets for United States federal income tax purposes. Furthermore, the following discussion does not address United States federal taxes other than income taxes.

For purposes of this discussion, a "Non-U.S. Holder" is a beneficial owner of a Claim or Interest that is neither a partnership (or other entity treated as a partnership for United States federal income tax purposes) nor (1) an individual who is a citizen or resident of the United States, (2) a corporation created or organized under the laws of the United States or any state or political subdivision thereof, (3) an estate, the income of which is subject to federal income taxation regardless of its source, or (4) a trust that (i) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (ii) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

If a partnership (including any entity treated as a partnership for United States federal income tax purposes) holds Claims or Interests, the United States federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners. A partnership considering participating in the Plan should consult its tax advisor regarding the consequences to the partnership and its partners of the Plan.

**Each holder of a Claim or Interest should consult its tax advisor regarding the United States federal, state, local and any foreign tax consequences of the transactions described herein or in the Plan.**

### A. Certain United States Federal Income Tax Consequences to the Debtor

#### 1. Cancellation of Indebtedness Income

Under the Plan, the Debtor will distribute $1 million to satisfy outstanding obligations of approximately $21,650,000 to holders of Allowed TruPS Claims. Under general United States federal income tax principles, the Debtor will realize cancellation of indebtedness ("COD") income to the extent that its obligation to a holder is discharged pursuant to the Plan for an amount less than the adjusted issue price (in most cases, the amount the Debtor received upon incurring the obligation, with certain adjustments) of such holder's claim. For this purpose, the amount paid to a holder in discharge of its TruPS Claim will equal the value of the New Common Stock distributed to such holder. Where the Debtor joins in the filing of a consolidated United States federal income tax return, applicable Treasury regulations require, in certain circumstances, that certain tax attributes of the consolidated subsidiaries of the Debtor and other members of the group be reduced. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (i.e., such attributes may be available to offset taxable income, if any, that is generated between the date of discharge and the end of the debtor's tax year and/or may be carried back to prior years).

Because the Debtor will be a debtor in a bankruptcy case at the time it realizes COD income, the Debtor will not be required to include such COD income in its gross income, but rather it will be required to reduce certain of its tax attributes by the amount of COD income so excluded. Generally, the required attribute reduction will be applied to reduce the Debtor's net operating losses and net operating loss carryforwards (collectively, "NOLs").

#### 2. Utilization of Net Operating Losses (NOLs)

If a corporation experiences an "ownership change" (within the meaning of Section 382 of the Tax Code), the corporation's ability to utilize its NOLs and certain other tax attributes to offset future taxable income generally will be subject to certain limitations. Section 382 of the Tax Code may also limit a corporation's ability to use certain "net unrealized built-in losses" existing on the date of the ownership change but recognized within five years of the ownership change to offset future taxable income.

The Debtor's Restructuring transactions as set forth above are premised on the preservation of certain deferred tax assets.   To the extent the Debtor's assumptions underlying the preservation of these assets are successfully challenged, the investment value and the commitment represented by the New Investment will be placed at risk.

#### 3. Alternative Minimum Tax

A corporation may incur alternative minimum tax liability even in the case that NOL carryovers and other tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax. It is possible that the Debtor may be liable for the

alternative minimum tax as a result of the consummation of the restructuring transactions pursuant to the Plan.

## X. OTHER MATTERS

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact counsel for the Debtor.

### XI. RECOMMENDATION AND CONCLUSION

THE DEBTOR BELIEVES THAT THE PLAN'S CONFIRMATION IS IN THE BEST INTERESTS OF THE DEBTOR, ITS ESTATE, AND ITS CREDITORS. FOR THESE REASONS, THE DEBTOR URGES ALL HOLDERS OF CLAIMS AND INTERESTS TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE THEIR ACCEPTANCE BY DULY COMPLETING AND RETURNING THEIR BALLOTS SO THAT THEY WILL ACTUALLY BE RECEIVED BY THE DEBTOR ON OR BEFORE 5:00 P.M. (EASTERN TIME) ON**.**

_____

Dated: Elkton, Maryland, June 30, 2017

CECIL BANCOROP, INC.

By:    _Terrie G. Sprio_____

Title:    President and Chief Executive Officer

and by its attorneys,

___/s/___Valerie P. Morrison_____
Valerie P. Morrison
Nelson Mullins Riley & Scarborough LLP
101 Constitution Ave., NW, Suite 900
Washington, DC 20001
Phone: 202 712-2800
val.morrison@nelsonmullins.com

Peter J. Haley
Nelson Mullins Riley & Scarborough LLP
One Post Office Square
Boston, Massachusetts 02109
Phone: (617) 573-4714
Fax: (617) 573-4750
peter.haley@nelsonmullins.com

J. Brennan Ryan
Nelson Mullins Riley & Scarborough LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, Georgia 30363